IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION ONE

| | |
|---|---|
| In the Matter of Marriage of | No. 79302-1-I |
| ALEXANDER TEN, | |
| Appellant, | |
| and | |
| NATALIA TEN, | UNPUBLISHED OPINION |
| Respondent. | FILED: December 9, 2019 |

VERELLEN, J. — Alexander and Natalia Ten married and dissolved their marriage in Russia. In 2010, a Russian court entered a child support order. And in 2014, a Russian bailiff/law enforcement officer entered an order and a decision (the 2014 decisions), concluding, as of December 3, 2014, Alexander was current with his child support obligation. In 2015, the couple remarried. In 2017, they dissolved that marriage in the United States. As part of the 2017 dissolution, the trial court granted comity to the 2010 Russian child support order but denied comity to the 2014 decisions.

Whether the 2014 decisions were Russian court rulings or administrative agency decisions, the doctrine of comity allows an American court to recognize those as valid and enforceable "judgments." Consistent with the purpose of the comity doctrine, to respect a foreign state's application of its own laws and ensure there is

an end to litigation, the party challenging comity has the burden to establish invalidity. Natalia, the party challenging comity as to the 2014 decisions, fails to establish invalidity. We exercise our discretion to grant comity to the 2010 Russian child support order and the 2014 decisions.

Therefore, we remand for the court to recalculate past child support consistent with this opinion.

FACTS

In July 2001, Alexander and Natalia were married in Russia. Their daughter, Daria, was born on October 11, 2001. In 2004, a Russian court dissolved their marriage, and Alexander moved to the United States. In February 2010, a Russian magistrate judge issued a "Court Order" imposing child support.[1] Under the order, Alexander was required to pay "1/4 of all types of earned income and other types of income per month."[2] Alexander sporadically sent various amounts of money to Natalia.

On October 16, 2014, a Russian "law enforcement officer" entered a "Law Enforcement Order," "calculat[ing] . . . the amount of the child support arrears."[3] The order stated Alexander "did not provide any documents to prove his income."[4] The officer calculated arrears based on the average monthly salary in Russia "in

---

[1] Ex. 17.
[2] Id.
[3] Ex. 113.
[4] Id.

2

accordance with provision 113 of the Family Code of the Russian Federation."[5] According to the order, at that time, the average monthly salary was 32,272 rubles. The officer found the total amount of arrears was 408,021 rubles, as of October 16, 2014. The officer also found "[t]he partial payment made for the period of time mentioned . . . is 00-00 rubles."[6]

After the officer entered the October 2014 order, Alexander retained an attorney in Russia to represent him regarding the amount in child support he had already paid. On December 3, 2014, the officer issued the "Decision Of the Court Bailiff and Executor of Justice On the Calculation of Indebtedness for Child Support Payments."[7] The officer found the total amount of arrears was 419,929.11 rubles.[8] Alexander's attorney in Russia submitted evidence of Alexander's prior payments. The officer listed Alexander's prior payments in the December "Decision" and ruled, "the amount of indebtedness for child support payments shall be determined as of 03.12.2014 (03 December 2014) in the amount of 00.00 rubles."[9]

Also on December 3, 2014, the officer sent a letter to Natalia about the decision. The officer informed Natalia the agency was returning her enforcement order because their investigation revealed that Alexander "permanently lives in the

---

[5] Id.
[6] Id.
[7] Ex. 19.
[8] Id.
[9] Id.

United States of America" and "does not possess any property which may be withheld."[10]

The officer recommended that Natalia "send the motion [to designate and enforce the Russian child support order] along with the enclosed documents listed above to the Department of Justice of the Russian Federation," and "[t]he Department will send it out to the foreign court."[11] At trial, Natalia testified she did not receive this letter.

On December 8, 2014, the officer issued a "Decision on Closing the Enforcement Proceedings and Returning the Enforcement Document to the Plaintiff."[12] The officer determined:

> In the course of executing the requirements specified in the enforcement document, it has been determined that the enforcement document for which no penalties were recovered (penalties were recovered partially) is to be returned to the Plaintiff due to the fact that the Debtor has no property that can be used to recover penalties, and all of the actions permissible in accordance with the applicable laws performed by the court bailiff and executor of justice aimed at finding the Debtor's property have produced no results.[13]

As a result, the officer decided to close the proceeding. The officer explained that "the fact that the enforcement document is returned to the Plaintiff does not constitute an impediment for the enforcement document to be resubmitted for enforcement."[14] The officer also explained Natalia had "the right to resubmit for enforcement the

---

[10] Ex. 112.

[11] Id.

[12] Ex. 18.

[13] Id.

[14] Id.

4

enforcement documents . . . not sooner than six months after the date of the decision on the closing of enforcement proceedings and returning the enforcement document to the Plaintiff."[15]

In early 2015, the parties met in Vienna for a family vacation. Alexander and Natalia discussed a reconciliation. In August 2015, Natalia and Daria arrived in the United States. On October 11, 2015, Alexander and Natalia remarried in the United States.

The parties separated on January 24, 2017 and on February 15, 2017, Alexander filed for dissolution. In her answer, Natalia sought "unpaid back child support pursuant to an order issued in Russia."[16] In April 2017, the court entered agreed temporary orders. Under the temporary orders, Alexander was required to pay $3,000 a month for spousal maintenance and $1,028 a month for child support.

On March 13, 2018, six days before trial was scheduled to begin, the parties entered into a CR 2A agreement resolving parenting, spousal maintenance, division of property, and future child support. With regard to back child support, the parties . agreed the CR 2A did not address any past due amount or interest owed. The court continued trial to allow time for registration and translation of the Russian orders.

On May 16, 2018, Natalia moved to register the 2010 Russian child support order, under chapter 26.21A RCW of the Uniform Interstate Family Support Act (UIFSA). Alexander opposed the registration on various procedural grounds. In her

---

[15] Id.

[16] Clerk's Papers (CP) at 9.

5

reply, Natalia alternatively argued comity required the court to recognize the 2010 order.

At the start of the trial, the court declined to register the 2010 child support order or to invoke comity as to that order. Over four days, the court heard testimony from Alexander and Natalia. At the end of trial, the court stated:

> [I]t is possible that after looking at some of the law again, and I have read what I think applies, particularly with regard to comity and registration, I may have some questions, which I would send to you via email if I want you to address a particular case or something.[17]

On August 10, 2018, the court issued final orders. In the "Court's Addendum Findings and Conclusions," the court recognized the October 16, 2014 letter from the Russian law enforcement officer to Natalia indicating the amount of arrears as of that date was 408,021 rubles. The court also acknowledged the April 6, 2017 letter from the officer indicating the enforcement action was completed "due to inability to enforce."[18]

But the court discounted the December 2014 decision that, as of December 3, 2014, Alexander was current in his child support obligation. Specifically, the court determined, "[T]he child support case in Russia was closed and Mr. Ten found to owe nothing because he evaded the order entered under Russian law. . . . [H]e never told the Russian court or any of its agents what his income was."[19] The court found

---

[17] Report of Proceedings (RP) (June 7, 2018) at 340.

[18] CP at 153.

[19] CP at 153-54.

6

Alexander's "testimony that no one ever asked him to [disclose his actual income] is disingenuous."[20]

The court enforced the 2010 order and calculated arrears at $170,000, with interest, for February 2010 through October 2015 and $3,084 for January 2017 through March 2017.

On October 29, 2018, the court denied Alexander's motion for reconsideration. Alexander appeals.

## ANALYSIS

### I. Comity

Alexander argues comity applies to the February 3, 2010 "Court Order," the October 16, 2014 "Law Enforcement Order," and the December 3, 2014 "Decision of the Court Bailiff." Natalia argues comity applies only to the February 2010 order.

> "Comity is a recognition which one nation extends within its own territory to the legislative, executive, or judicial acts of another. It is not a rule of law, but one of practice, convenience, and expediency. Although more than mere courtesy and accommodation, comity does not achieve the force of an imperative or obligation. Rather, it is a nation's expression of understanding which demonstrates due regard both to international duty and convenience and to the rights of persons protected by its own laws."[21]

---

[20] CP at 154.

[21] In re Estate of Toland, 180 Wn.2d 836, 846, 329 P.3d 878 (2014) (quoting Mayekawa Mfg. Co. v. Sasaki, 76 Wn. App. 791, 799, 888 P.2d 183 (1995)).

Both trial and appellate courts have the discretion to apply the doctrine, to give effect to the law and resulting orders of another jurisdiction.[22] The doctrine of comity applies to valid judgments.[23]

A judgment is valid if

(a) the state in which it is rendered has jurisdiction to act judicially in the case; and

(b) a reasonable method of notification is employed and a reasonable opportunity to be heard is afforded to persons affected;

(c) the judgment is rendered by a competent court; and

(d) there is compliance with such requirements of the state of rendition as are necessary for the valid exercise of power by the court.[24]

Valid foreign judgments "will be accorded the same degree of recognition to which sister State judgments are entitled . . . because the public interest requires that there be an end of litigation."[25]

In the context of the doctrine of comity, "judgment" has a broad meaning:

Although a state ordinarily exercises judicial jurisdiction through its courts, in the absence of constitutional limitation it may do so through its legislature or through its executive and administrative agencies . . . . The decisions of such bodies, acting judicially, are covered by the rule of this Section.[26]

---

[22] Pruczinski v. Ashby, 185 Wn.2d 492, 506-07, 374 P.3d 102 (2016).

[23] Rains v. State, Dep't of Soc. & Health Servs., Div. of Child Support, 98 Wn. App. 127, 134, 989 P.2d 558 (1999).

[24] RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 92 (AM. LAW INST. 1971).

[25] RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 98, cmt. b (AM. LAW INST. 1971).

[26] RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 92 (AM. LAW INST. 1971) (emphasis added).

The October 16 order and December 3 decision are both signed by "E.G. Krivets." The October order lists Krivets as a "law enforcement officer," and the December decision lists Krivets as a "court bailiff and executor of justice."[27] The record does not contain evidence explaining the exact role of either a bailiff or an officer in the Russian legal system. But whether the 2014 decisions were issued as a ruling by a quasi-judicial body or an administrative agency, it is clear they were official child support enforcement decisions. It appears both of the 2014 decisions fall within the broad definition of a "judgment" for purposes of comity.[28]

Here, the trial court decision to grant comity as to the 2010 child support order but not the 2014 child support enforcement decisions is based on untenable reasons. The court concluded, "[T]he child support case in Russia was closed, and Mr. Ten [was] found to owe nothing because he evaded the order entered under Russian law. . . . [H]e never told the Russian court or any of its agents what his income was."[29] Although it appears that Alexander limited his activity in the Russian proceeding to

---

[27] Different translators translated the decisions from Russian to English.

[28] See RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 92 cmts. d, e, h-j (AM. LAW INST. 1971) (Normally, application of the doctrine of comity to a foreign judgment would be supported by expert testimony, which would address: (1) whether the rendering state had judicial jurisdiction in the case, (2) whether the parties received notice, (3) whether the parties had an opportunity to be heard, (4) whether the judgment was rendered by a competent court, and (5) whether the judgment complied with the "requirements of the state of rendition [as are necessary] for the valid exercise of power by the court." However, on the existing record and briefing in this case, the absence of such evidence from an expert does not necessarily foreclose the exercise of our discretion to apply comity.)

[29] CP at 153-54 (emphasis added).

providing evidence of his support payments,[30] the trial court had no basis to interpret the nuances of the Russian child support law. It appears that the court did not have the text of the pertinent Russian statutes. Natalia provides neither an adequate factual record nor compelling legal authority to support the trial court's conclusion that Alexander evaded his obligations under Russian law.

The core question on appeal is what burden Natalia had in opposing the application of comity to the 2014 decisions. She offers no authority on who has the burden when the party asserting comity as to a court order then opposes comity as to subsequent decisions regarding the enforcement of the judgment.

In In re Estate of Toland, our Supreme Court analyzed whether a Japanese divorce decree opposed by the father was entitled to comity.[31] The court concluded the Japanese dissolution decree was a valid foreign judgment, reasoning:

> [The father] has not shown that the Japanese court issuing the divorce decree was incompetent. He had the opportunity to contest the decree and in fact did so with the assistance of a team of Japanese attorneys. The divorce decree is supported by a lengthy written decision. The fact that damages were awarded for fault (psychological abuse) that would not be available in our state does not render the decree unfair or so antithetical to our law and policy as to preclude the decree's recognition as a matter of comity. Importantly, [the father] had a right to appeal the divorce decree but did not do so.[32]

---

[30] See Ex. 19 ("The Debtor has not provided any information regarding his workplace or any document to verify his earned income and/or any other types of income.").

[31] 180 Wn.2d 836, 329 P.3d 878 (2014).

[32] Id. at 848 (emphasis added). Although the trial court determined the decree was valid, it denied comity because the father did not receive notice of a guardianship proceeding started two years after the decree was entered. Ultimately, the Supreme Court reversed the trial court because the entirely separate guardianship proceeding had nothing to do with the divorce decree. Our Supreme Court noted that the father did not take the opportunity to appeal the divorce decree.

Ultimately, the court concluded, "The Japanese divorce decree is a valid foreign judgment that meets requirements for comity, as both the trial court and the Court of Appeals correctly determined."[33]

As Toland illustrates, due process is a core consideration when addressing the applicability of comity to a foreign judgment.[34] And, consistent with Toland, it appears that the party opposing comity on the grounds that the judgment was invalid, including a due process challenge, has the burden to establish invalidity.

Here, Natalia contends, "Alexander failed to present evidence that the [December] 2014 Decision was obtained by giving notice to Natalia."[35] But she does not provide any citation to the record or argument establishing that she did not receive notice or an opportunity to be heard prior to entry of the 2014 decisions. Rather, Natalia admitted she was aware of the proceedings and provided information about Alexander's prior payments to the bailiff/law enforcement officer.[36]

On the existing record and briefing, we conclude that Natalia had the burden to establish a legitimate challenge because she was the party disputing the application of comity to the 2014 decisions. Specifically, Natalia had the burden to

---

[33] Id. at 854.

[34] See also 16D CORPUS JURIS SECUNDUM CONSTITUTIONAL LAW § 1996, Recognition of Foreign Judgments (Sept. 2019 Update) ("Due process requires that no jurisdiction may give effect, even as a matter of comity, to a judgment acquired elsewhere, if due process requirements were not met in the foreign jurisdiction.").

[35] Resp't's Br. at 9.

[36] RP (June 7, 2018) at 259 ("I did talk to the bailiffs. I talked to the last bailiff, and I told them [ ] what he paid me.").

establish the 2014 decisions were issued by an incompetent court or by an agency lacking judicial jurisdiction. She also had the burden to establish the decisions were issued in violation of due process. She makes no such showing.

Additionally, similar to the father in Toland, Natalia had the opportunity to appeal in Russia but did not do so. In the October 2014 order, the law enforcement officer informed Natalia, "This Order can be appealed to the next higher official of the Law Enforcement Agency or to the court during 10 days."[37] And in the December 2014 decision, the bailiff informed Natalia, "This decision may be disputed by way of subordination to the superior official at the court bailiff service or appealed at court within a period of ten days."[38] Although she claims she did not timely receive the December 3, 2014 letter which accompanied the December decision and included more details about her right to appeal, Natalia does not dispute that she timely received the October 2014 order and December 2014 decision. And both of the 2014 decisions separately informed Natalia of her right to appeal.

In opposing the application of comity to the 2014 decisions, Natalia attempts to collaterally attack the Russian law enforcement officer/bailiff's determination that, as of December 3, 2014, Alexander was current with his child support obligation. The underlying purpose of the comity doctrine is to respect a foreign state's application of its own laws and ensure there is an end to litigation. With this purpose in mind and on the existing record and briefing, comity properly extends to the October 2014 "Law

---

[37] Ex. 113.
[38] Ex. 19.

Enforcement Order" and the December 2014 "Decision of the Court Bailiff," along with the 2010 Russian child support order. Alexander was entitled to the benefit of the Russian bailiff's determination that, as of December 3, 2014, Alexander owed nothing in child support arrears.

We remand for the court to recalculate arrears between December 3, 2014 and the parties' reconciliation in August 2015, and between the parties' subsequent separation in February 2017 and entry of the temporary orders in April 2017, based upon Alexander's actual income.[39]

## II. Arbitration

Alexander contends the court erred when it entered the final order on child support because, he argues, the court should have ordered arbitration, as provided by the CR 2A agreement.

We interpret a CR 2A agreement under normal contract principles.[40] "If the reviewing court 'can fairly say that the parties' arbitration agreement covers the dispute, the inquiry ends because Washington strongly favors arbitration.'"[41]

Here, before trial, the parties entered into a CR 2A agreement resolving parenting, spousal maintenance, division of property, and future child support. The parties agreed the CR 2A did not address any past due amount or interest owed. The CR 2A agreement contained an arbitration provision which provided, "If final

---

[39] Given this conclusion, we do not need to address Alexander's alternative due process and substantial evidence challenges.

[40] In re Marriage of Pascale, 173 Wn. App. 836, 842, 295 P.3d 805 (2013).

[41] Id. (quoting Davis v. Gen. Dynamics Land Sys., 152 Wn. App. 715, 718, 217 P.3d 1191 (2009)).

papers have not been entered or agreed within a reasonable time, then an arbitration/presentation date may be scheduled with Caroline Davis, who shall resolve any drafting disputes regarding the final orders."[42]

Alexander argues the final order differs from the temporary order because it changed the due date for support and required him to pay a proportionate share of Daria's extracurricular expenses and car insurance. In response to the court's final order, although Alexander challenged the due date and the provision addressing Daria's extracurricular expenses and car insurance, he did not seek to arbitrate those specific disputes. On reconsideration, regarding the child support worksheets, Alexander argued, "The court should have referred any issues regarding current support to arbitrator Caroline Davis pursuant to the parties' CR 2A agreement."[43] But Alexander did not seek to arbitrate his disputes concerning the payment date and the extracurricular expenses and car insurance. The court did not err when it did not order arbitration.

III. Fees on Appeal

Natalia seeks fees on appeal due to Alexander's intransigence. In his reply brief, Alexander challenges Natalia's request and argues he is entitled to fees on appeal because it is instead the mother who has acted unreasonably. We decline to award attorney fees on appeal to either party.

---

[42] Ex. 13.

[43] CP at 108.

Therefore, we remand for the court to recalculate past child support consistent with this opinion.

WE CONCUR: